IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MUHAMAD ALY RIFAI, M.D** <br><br> *Plaintiff,* <br><br> AGAINST <br><br> **MERRICK B. GARLAND**, in his official capacity as Attorney General of the United States <br><br> **THE UNITED STATES DEPARTMENT OF JUSTICE** <br><br> **THE UNITED STATES DRUG ENFORCEMENT ADMINISTRATION** <br><br> **ANNE MILGRAM**, in her official capacity as Administrator of the United States Drug Enforcement Administration <br><br> **THE UNITED STATES OF AMERICA** <br><br> *Defendants.* | Case No. |

**COMPLAINT AND REQUEST FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Muhamad Aly Rifai, M.D. ("Dr. Rifai"), by and through his counsel, CHAPMAN LAW GROUP, brings this claim against Defendants Merrick B. Garland, in his official capacity as Attorney General of the United States; the United States Drug Enforcement Administration ("DEA"); Anne Milgram, in her own capacity as Administrator of the United States Drug Enforcement Agency ("DEA Administrator"); and the United States of America (collectively, the "Defendants"), alleges, based on his own knowledge and belief:

1

**I.     INTRODUCTION**

1. This action for injunctive and declaratory relief arises out of the DEA's compulsion to have Dr. Rifai participate in an unconstitutional administrative process before the DEA's Administrative Law Judge ("ALJ").

2. DEA was granted authority to regulate controlled substances through the Controlled Substances Act of 1970 ("CSA"), 21 U.S.C. § 801 *et seq.*, as well as its own self-promulgating regulations. DEA operates on its own accord through the Attorney General's delegation of regulatory authority under the CSA.

3. The CSA and its regulations authorize DEA to grant licenses to prescribe controlled substances. DEA may also revoke a license if it finds that the continued registration to prescribe controlled substances is "contrary to the public interest."

**II.    THE PARTIES**

4. Plaintiff Dr. Rifai is a psychiatrist who practices in the State of Pennsylvania and owns Blue Mountain Psychiatry. Dr. Rifai is pending a criminal trial in this District Court for allegations of health care fraud.

5. Defendant Merrick B. Garland is the Attorney General of the United States ("AG Garland"), and the head and principal officer of the United States Department of Justice. AG Garland maintains the authority to enforce the CSA, but has chosen to delegate this authority to the DEA Administrator. 28 C.F.R. § 0.100. He is being sued in his official capacity. The Office of the Attorney General's address is 950 Pennsylvania Avenue NW, Washington, DC 20530.

6. Defendant United States Department of Justice ("DOJ") is an executive department of the United States and is controlled by the Attorney General. *See*, 5 U.S.C. § 101; 28 U.S.C. § 501. The DOJ's address is 950 Pennsylvania Avenue NW, Washington, DC 20530.

7. Defendant United States Drug Enforcement Administration ("DEA") is a federal government agency assigned to monitor and enforce the controlled substance laws and regulations of the United States and is headquartered in Virginia. The DEA's address is 8701 Morrissette Drive, Springfield, VA 22152.

8. Defendant Anne Milgram is the Administrator of the DEA. She is being sued in her official capacity. The Office of the DEA Administrator's address is 8701 Morrissette Drive, Springfield, VA 22152.

9. Defendant United States of America is named in accordance with 5 U.S.C. § 702.

## III.  JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 702 as Plaintiff is a person suffering legal harm by agency action and 28 U.S.C. §§ 1331, 1346 as this action arises under the Constitution and laws promulgated by the United States Congress concerning prescribing authority of controlled substances.

11. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Plaintiff resides in this District and no real property is involved in this action.

## IV.  FACTUAL ALLEGATIONS

### A. Dr. Rifai is a Licensed Psychiatrist Who Prescribes Controlled Substances in Accordance with DEA Requirements

12. Dr. Rifai is a psychiatrist who practices in the State of Pennsylvania. Dr. Rifai has practiced medicine psychiatry for over twenty (20) years, becoming board certified by: the American Board of Internal Medicine; the American Board of Psychiatry and Neurology in Psychiatry; the American Board of Psychiatry and Neurology in Psychosomatic Medicine; the American Board of Addiction Medicine; and by the American Board of Preventative Medicine in Addiction Medicine.

3

13. Along with practicing medicine, Dr. Rifai operates several clinics under the name Blue Mountain Psychiatry, LLC. Blue Mountain Psychiatry's locations are largely in remote or rural locations, providing these areas with the psychiatric treatment it desperately needs.

14. Dr. Rifai was born and raised in Syria, immigrating to the United States after graduating with his M.D. from the University of Aleppo Faculty of Medicine in 1996. Dr. Rifai continued his medical pursuit by joining the University of Tennessee's Health Science Center, College of Medicine in Memphis, where he completed a neuroscience research fellowship. Dr. Rifai continued to push forward, where he completed training in a combined Internal Medicine and Psychiatry Program through the University of Virginia School of Medicine in Roanoke and Salem, Virginia. Then, Dr. Rifai completed a fellowship in psychosomatic medicine and psychiatric research at the National Institute of Mental Health in Bethesda, Maryland.

15. Because of Dr. Rifai's tireless efforts as a healer, he has been awarded several honors and has penned many articles on the practice of medicine. But despite these recognitions, Dr. Rifai has kept his promise to serve his community with the utmost care and respect. By way of example and not limitation, Dr. Rifai was one of very few physicians to administer COVID-19 vaccines to the public throughout the COVID-19 pandemic. Dr. Rifai regularly volunteers to treat those in his community, and because of his charitable actions, he is held in high esteem by those who surround him.

16. Dr. Rifai has continued to maintain all licenses and certifications required by the State of Pennsylvania and the United States, and until November 2022, had never experienced legal issues related to his practice of medicine.

### B. *DEA Administrative Law Judges*

17. DEA ALJs function as officers pursuant to Article II of the United States Constitution. DEA ALJs are appointed under the Administrative Procedure Act ("APA")[1]. Under that statute, ALJs are tasked with presiding over administrative proceedings, occupying a continuing office, and exercising significant authority. By way of example and not limitation, 21 CFR §§ 1316.52 and 1316.42(f) instructs DEA ALJs that they *shall* oversee administrative proceedings. 5 CFR § 930.204(a) further holds that DEA ALJs receive career appointments and *may not face probationary periods* other government employees may be subjected to.

18. The Supreme Court recently held in *Lucia*[2] that ALJs who operate with the same broad discretion to exercise the agency's significant authority in administrative hearings are to be considered inferior officers. Additionally, the Supreme Court granted certiorari to hear an analogous case *Jarkesy v. SEC* on June 30, 2023[3], to decide whether, among other things, the Fifth Circuit's finding that the statutory removal restrictions for SEC ALJs is unconstitutional[4] and whether the Congress unconstitutionally delegated legislative power to the SEC[5].

19. Under its current structure, 5 U.S.C. § 556(c) grants DEA ALJs the authority to:

    a. Administer oaths and affirmation;

    b. Issue subpoenas authorized by law;

    c. Rule on offers of proof and receive relevant evidence;

---

[1] It is currently unknown as to who controls the appointment DEA Administrative Law Judges. However, instructions to apply for Administrative Law Judge positions is available via the U.S. Office of Personnel Management's website, where it can be inferred a DEA ALJ would apply. *See* https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/specialty-areas/administrative-law-judge-positions/
[2] *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018).
[3] *SEC v. Jarkesy*, 143 S. Ct. 2688 (2023).
[4] *Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022).
[5] Jarkesy v. SEC, 34 F.4th 446, 459 (5th Cir. 2022).

    d.  Take depositions or have depositions taken when the evidence of justice would be served;

    e.  Regulate the course of the hearing;

    f.  Hold conferences for the settlement or simplification of the issues by consent of the parties or by the use of alternative means of dispute resolution;

    g.  Inform the parties as to the availability of one (1) or more alternative means of dispute resolution, and encourage use of such methods;

    h.  Require the attendance at any conference held…;

    i.  Dispose of procedural requests or similar matters;

    j.  Make or recommend decisions…; and

    k.  Take other action authorized by agency rule consistent with the APA.

20. Through the authority of the DOJ, DEA has been tasked with enforcing the CSA. The scope of DEA's authority relevant here is to register applicants to distribute controlled substances unless it is inconsistent with the public interest. *See*, 21 U.S.C. § 823(b). As with all federal agencies, DEA adjudicative actions are limited to what it is proscribed by statute.

21. After receiving a DEA registration to distribute controlled substances, the DEA may revoke, restrict, or suspend that license only if the licensing of that individual becomes inconsistent with the public interest. *See*, 21 U.S.C. § 824(a). The DEA may revoke, restrict, or suspend the DEA registration only after notice is given to the registrant through an order to show cause and the registrant has had an opportunity to be heard. *See*, 21 U.S.C. § 824(c).

    **C.  *Improper Application and Use of DEA Administrative Subpoena***

22. Between May 17, 2021, and August 9, 2021, the DEA and local police department launched a joint investigation into Blue Mountain Psychiatry to determine whether Dr. Muhamad

Rifai was distributing controlled substances outside the ordinary course of professional conduct and without a legitimate medical purpose.

23. As part of its investigation, DEA requested that local police officer, Gretchen Kraemer, participate in an undercover operation, where Officer Kraemer was to pose as a new patient suffering with psychological symptoms. The undercover investigation initiated on May 17, 2021, when Officer Kraemer visited Dr. Rifai's clinic for psychiatric treatment. The investigation concluded on August 9, 2021, after Officer Kraemer's third and final appointment with Dr. Rifai.

24. On November 8, 2022, the United States indicted Dr. Rifai on four (4) counts of Health Care Fraud in the Eastern District of Pennsylvania. It can be assumed that the DEA assisted in the investigation of Dr. Rifai before bringing these charges.

25. Over two (2) years after its investigation closed, the DEA served Dr. Rifai a subpoena on September 26, 2023 ("Administrative Subpoena"). Within it, the DEA requested that Dr. Rifai disclose all documents related to "Gretchen Davis" with the instruction not to disclose the existence of the request or investigation for an indefinite period, as "any such disclosure could impede the criminal investigation being conducted and interfere with the enforcement of the Controlled Substances Act." (*See*, Attachment A, Administrative Subpoena).

26. Before responding and producing these documents, Dr. Rifai retained undersigned counsel to review and advise Dr. Rifai on the contents and potential ramifications of the Administrative Subpoena. As part of its preparation, Dr. Rifai's counsel contacted Diversion Investigator Andrew Lastoskie ("DI Lastoskie") to ask about the scope of the investigation and the purpose of the subpoena. DI Lastoskie confirmed that the Administrative Subpoena's purpose was limited to its use in an administrative investigation. (*See*, Attachment B, Email Correspondence with DI Lastoskie).

27. Inexplicably, after the DEA delivered its subpoena to Dr. Rifai's counsel, two (2) DEA agents arrived at Dr. Rifai's clinic to personally serve him with a physical copy of the subpoena. There, the DEA agents warned that if Dr. Rifai were to not comply with the production of documents sought, they may return to take him away in handcuffs.

28. On October 10, 2023, Dr. Rifai, through his counsel, responded to the subpoena and provided the requested file for his former patient, Gretchen Davis. (*See*, Attachment C, Letter Response to Administrative Subpoena). In his response, counsel noted multiple concerns with the DEA's Administrative Subpoena. First, the case number associated with the Administrative Subpoena was CK-21-2001—the same one used in subpoenas related to Dr. Rifai's pending criminal action. Second, the subpoena's language stated that the documents might relate to an "ongoing criminal investigation." Despite DI Lastoskie's assurances, Dr. Rifai's counsel further noted his concerns with the Administrative Subpoena, warning of the ramifications if the production were to be misused, but relying on the assurances of the DEA, Dr. Rifai complied with the subpoena and delivered the requested documents.

29. Moving to December 1, 2023, Dr. Rifai then received an Order to Show Cause ("OTSC") from the DEA. (*See*, Attachment D, DEA Order to Show Cause). There, the DEA alleged that Dr. Rifai had violated several laws at Blue Mountain Psychiatry and because of those alleged violations, DEA argues that Dr. Rifai's DEA registration is inconsistent with the public. Inside the OTSC, Dr. Rifai was ordered to choose to either give up his DEA license or request a hearing. As was his right, Dr. Rifai requested a hearing in front of the Administrative Law Judge on December 28, 2023, to defend against these allegations of misdeeds. (*See*, Attachment E, Request for Hearing).

30. Problematic here is the DEA's requirement that a respondent testify at their administrative hearing. To have any chance of escaping the administrative hearing with only a sanction, the respondent must accept guilt of all accusations with an explanation describing corrective actions. Even when truly innocent, repentance before the DEA ALJ is required to avoid total loss of DEA registration. And even this performance rarely provides an outcome other than the loss of the respondent's DEA registration.

31. Shortly after Dr. Rifai submitted his request for a hearing, Assistant United States Attorney Joan Burnes ("AUSA Burnes"), who is currently prosecuting Dr. Rifai for alleged health care fraud (Case No. 5:22-cr-00390), received the contents of the Administrative Subpoena production as well as all filings related to this administrative action. The AUSA then sent these documents to Dr. Rifai's defense counsel, revealing the Government's intent to use this information as Rule 404(b) evidence of prior bad acts, contrary to the DEA's assurances of the subpoena's use and in violation of Dr. Rifai's Fourth Amendment protections. On February 12, 2024, the AUSA Burnes formally filed a motion *in limine* to introduce these documents as evidence of prior bad acts.

32. Now, Dr. Rifai is placed in an impossible situation where he must choose either to continue to invoke his Fifth Amendment right to remain silent during his criminal case or defend himself on the administrative front. The severity of a guilty conviction in a criminal trial is widely understood. But without testifying at the DEA's administrative hearing, Dr. Rifai will be stripped of his DEA registration, which, to a psychiatrist, is the removal of his license to practice medicine. Because DEA ALJs draw adverse inferences when respondents do not testify[6], Dr. Rifai is inherently compelled to testify at his DEA administrative hearing. Given the underhanded tactics taken by the DEA to this point, Dr. Rifai will be coerced to answer questions

---

[6] *MacKay v. Drug Enf't Admin*, 664 F.3d 808, 820 (10th Cir. 2011).

about information outside the scope of the undercover encounter and the prescribing of controlled substances.

33. Even at this early juncture the DEA has violated Dr. Rifai's Fifth Amendment right to remain silent by incentivizing a confession, regardless of guilt, with the hopes Dr. Rifai may maintain his DEA registration. But if Dr. Rifai were to submit such testimony, admitting to criminal violations he did not commit, AUSA Burnes will use Dr. Rifai's testimony as evidence against him. In its most recent filing, the DEA's counsel argued that Dr. Rifai's "insufficient" prehearing statement outlining his testimony should summarily be considered an admission of guilt on all alleged violations. If granted, Dr. Rifai would be stripped entirely of his ability to defend himself here, removing any recourse before depriving him of his livelihood.

34. Given the DEA's actions to this point, Dr. Rifai's testimony will be used as a tool against him in his criminal trial, subverting his words and twisting them to fit a predetermined narrative.

## V.   CAUSES OF ACTION

### COUNT ONE
DI Lastoskie Violated Dr. Rifai's Fourth Amendment Right
Against Unreasonable Searches and Seizures.
(5 U.S.C. § 706(2))

35. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

36. Defendant DI Lastoskie disregarded Dr. Rifai's constitutional protections against unreasonable searches and seizures by using an administrative subpoena outside the permitted uses to receive a patient file at the direction of the AUSA.

37. DI Lastoskie attempted to circumvent Dr. Rifai's Fourth Amendment protections by purposefully misrepresenting to Plaintiff the purpose of the subpoena. DI Lastoskie guaranteed to undersigned counsel that the purpose of the subpoena was strictly in relation to an administrative investigation to dissuade any concerns with the delivery of documents. As DI Lastoskie knew,

such assurances would foreclose the concern that the information provided would then be used against Dr. Rifai in his criminal investigation.

38. As a diversion investigator, DI Lastoskie knew the laws he must abide by when serving an administrative subpoena, especially those protected by the Constitution and its Amendments. And even if DI Lastoskie did not know of his rights prior to this subpoena, Dr. Rifai's counsel put DI Lastoskie on notice of the misuse of administrative subpoenas. In fact, undersigned counsel specifically referenced the misuse of the administrative subpoena in the same manner used here.

39. Yet DI Lastoskie still chose to violate Dr. Rifai's protections. With knowledge of the consequences of misusing the administrative subpoena process, DI Lastoskie asserted the false claim that this subpoena only related to "an ongoing" administrative case. In full reliance of this false statement, Dr. Rifai provided the DEA a patient file which, shortly after his decision to request a hearing on the Order to Show Cause, was delivered to Dr. Rifai's criminal defense attorney as "evidence" of Dr. Rifai's "prior bad acts" to be used against Dr. Rifai in his pending criminal trial.

40. The law dictating approved uses administrative subpoenas has changed over the years, but one protection has remained constant: warrantless administrative subpoenas may not be issued against targeted individuals when investigating criminal activity.[7] Regardless of the expansion to the administrative powers, once criminal investigations have launched and an individual is targeted, a warrant is required. Dr. Rifai was much more than "a targeted individual" when the subpoena was issued—he was on the eve of a federal criminal trial. As such, the warrantless Administrative Subpoena served upon Dr. Rifai was an unconstitutional breach of his Fourth Amendment protection against unreasonable searches and seizures.

---

[7] *United States v. Hossbach*, 518 F. Supp. 759, 766-67 (E.D. Pa. 1980).

41. Furthermore, without DI Lastoskie's materially false statements, Dr. Rifai would not have produced the documents sought in the subpoena. Without the documents produced by the Administrative Subpoena, this administrative proceeding would never have taken place. This entire administrative proceeding is built on DI Lastoskie's false statements and faulty subpoena.

42. Moreover, the two (2) DEA agents used threats of incarceration to compel Dr. Rifai to produce the documents sought in the subpoena. As mentioned above, Dr. Rifai was visited by two (2) agents of the DEA after they had served Dr. Rifai and his counsel with the Administrative Subpoena. During their visit, the DEA agents warned that if Dr. Rifai did not fully comply with the subpoena, they would personally arrest Dr. Rifai. This threat of incarceration was employed to improperly coerce Dr. Rifai to produce the documents sought without hesitation.

43. The Constitution does not permit the use of an administrative subpoena to circumvent the Fourth Amendment, especially when the production is caused by materially false statements made by the agent serving the administrative subpoena. Further, subpoenas cannot be issued to uncover evidence to use in the criminal trial under Rule 404(b). And lastly, government agents are forbidden from using such deceptive practices and issuing baseless threats to a person's freedom to ensure compliance with a subpoena, especially an administrative subpoena. But tragically, that is what occurred here.

44. As a result, Dr. Rifai was deprived of his Fourth Amendment protection against unreasonable searches and seizures, in violation of the Fourth Amendment of the United States Constitution.

### COUNT TWO

Compulsion of Dr. Rifai to Testify at DEA Administrative Hearing
Violates Dr. Rifai's Fifth Amendment Right Against Self-Incrimination
(5 U.S.C. § 706(2))

45. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

46. With knowledge of the ongoing criminal case against Dr. Rifai, Defendants acted in a concerted manner to strip Dr. Rifai of his right to remain silent.

47. Refusal to testify at a DEA hearing predetermines the fate of a respondent. When a respondent chooses not to testify, typically due to a parallel criminal case, the respondent will lose his DEA registration. After losing a DEA registration, it is effectively impossible to regain. If Dr. Rifai were to lose his registration purely because he invoked his Fifth Amendment right, this ruling will be used as evidence against him in the criminal trial.

48. This catch-22 purposefully created by Defendants will force Dr. Rifai to either waive his Fifth Amendment right or, given the importance of a DEA registration, never practice psychiatry again.

49. As explained above, refusal to testify guarantees Dr. Rifai will lose his DEA registration. Dr. Rifai uses his DEA registration daily to treat patients in his psychiatric practice. Without this registration, Dr. Rifai will be left without the tools required to treat his patients. But given the DEA and its agents eagerness to produce every document in the administrative proceeding to their criminal counterparts, any statement made by Dr. Rifai that might bear relevance to even a tangential matter in Dr. Rifai's criminal case will be delivered to the AUSA handling Dr. Rifai's criminal matter and distorted so much so that it serves as an admission of guilt.

50. Now, in Dr. Rifai's administrative case, the DEA's counsel has filed a motion *in limine* which requests that the ALJ find that Dr. Rifai's prehearing statement is deficient and is therefore an admission of guilt. If granted, the DEA would derive an admission of guilt from statements that have not been made. Given the severe consequences of such an admission, especially considering the parallel criminal proceedings, Dr. Rifai's ability to remain silent would now be

considered an admission of guilt. Such a finding would be contrary not only to the Constitution, but to logic itself and must be prohibited by this Court.

51. The intentional conflicts created by this Order to Show Cause placed Dr. Rifai in a position where, if even given the opportunity, he must testify. These actions strip Dr. Rifai of his right to remain silent in violation of the Fifth Amendment of the United States Constitution.

**COUNT THREE**

DEA's Unconstitutional Administrative Law Judge System
(5 U.S.C. § 706(2))

52. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

53. In the recent Supreme Court cases *Lucia v. SEC*, the Court declared the current system used to appoint and remove DEA administrative law judges is unconstitutional. *See also*, U.S. Const. Art. II, § 3. Yet the DEA has continued to operate its adjudicative system without change, contrary to the holding of this nation's highest court.

54. Further, the Supreme Court has recently granted certiorari to hear *Jarkesy v. SEC*, which contemplates two (2) issues. First, the Supreme Court has heard arguments related to the constitutionality of administrative law judges. *Jarkesy*, 34 F.4th at 464. Second, the Supreme Court has heard arguments as to whether administrative agencies hold the power to assign actions to agency adjudication or if they may only decide whether defendants should be subject to "certain legal processes" by "Article III proceedings." *Jarkesy*, 34 F.4th at 462.

55. Because of its continuous disregard for the Supreme Court's decisions, the DEA has subjected Dr. Rifai to participate in an unconstitutional process, and the Supreme Court should supply further guidance through its opinion in *Jarkesy*.

56. 5 U.S.C. § 706(2) provides six (6) specific instances a reviewing court should set aside action actions. Such a situation has arisen here, as an agency's actions go against a constitutional

right or privilege and the agency has exceeded its statutory authority. 21 U.S.C. §§ 706(2)(B), (C).

57. Because of Defendants' continued operation of its illegitimate adjudicative system, Dr. Rifai's administrative case should be set aside.

## COUNT FOUR
Application for Injunctive Relief (U.S. Const. Art. II, §§ 1, 3)

58. Plaintiff repeats and re-alleges each and every allegation in paragraphs one (1) through thirty (30) above as if fully set forth here.

59. Plaintiff seeks a preliminary and permanent injunction to enjoin Defendants from continuing to subject him to an unconstitutional administrative process.[8]

60. Plaintiff satisfies each factor for injunctive relief. First, Plaintiff has a substantial likelihood of success on the merits of this claim as precedent that is binding on this court has found that DEA and similar administrative ALJs adjudicatory structures are unconstitutional. As such, Plaintiff has and continues to experience irreparable harm as he is the subject of both this unconstitutional process and this unconstitutional process being used for unconstitutional means. Without injunctive relief, Dr. Rifai's future comes into question, which far outweighs any potential harm to Defendants if such relief is granted. Injunctive relief here would also serve the public interest, as future parties would not face the same unconstitutional process.

## COUNT FIVE
Declaratory Judgment (28 U.S.C. § 2201)

61. Plaintiff repeats and re-alleges each and every allegation in paragraphs one (1)through thirty-two (32) above as if fully set forth here.

---

[8] The assigned Administrative Law Judge has indicated her intent to stay the Administrative Proceeding upon the filing of this action and the filing of a stay action in the Administrative Proceeding.

62. Plaintiff requests a declaratory judgment that the statutes, regulatory provisions, and policies providing for the current appointment and removal process of DEA ALJs are unconstitutional.

## VI. PRAYER FOR RELIEF

WHEREFORE, Dr. Rifai respectfully requests that this Court enter judgment in its favor and grant the following relief:

A. Declare that the current system of adjudication maintained by DEA is contrary to the findings of the Supreme Court;

B. Preliminary injunctive relief halting the administrative hearing process before any DEA ALJ, up to and as long as the current unconstitutional appointment and removal provisions remain under 5 U.S.C. § 706(2)(A);

C. Preliminary injunctive relief pausing all proceedings and deadlines in Dr. Rifai's administrative hearing until at least the conclusion of Dr. Rifai's criminal case;

D. Award Plaintiff costs and attorney's fees; and

E. Grant any other relief that the Court deems just and proper.

Respectfully Submitted,
CHAPMAN LAW GROUP

Dated: March 22, 2024

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II (P73179)
*Attorney for Plaintiff Muhamad Aly Rifai, M.D.*
1441 West Long Lake Rd., Suite 310
Troy, MI  48098
T: (248) 644-6326
F: (248) 644-6324
RWChapman@ChapmanLawGroup.com

**PROOF OF SERVICE**

I hereby certify that on March 22, 2024, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

/s/ *Ronald W. Chapman II*
Ronald W. Chapman II (P73179)
*Attorney for Plaintiff Muhamad Aly Rifai, M.D.*
RWChapman@ChapmanLawGroup.com